# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

JAMES PRATER,

    Plaintiff,

v.                                                         CASE NO. 6:10-CV-194-ORL-36DAB

HEALTH AND WELFARE PLAN FOR
EMPLOYEES OF FLORIDA POWER AND
LIGHT GROUP, INC.,

    Defendant.
_____/

## ORDER

This cause comes before the Court on Defendant Health and Welfare Plan for Employees of Florida Power and Light Group, Inc.'s ("Defendant") Motion for Summary Judgment (Doc. 19). Plaintiff James Prater ("Plaintiff") filed a Response in opposition to Defendant's Motion for Summary Judgment (Doc. 38), to which Defendant replied (Doc. 43). Upon due consideration of the parties' submissions, the administrative record before the Court, and relevant case law, Defendant's Motion for Summary Judgment will be granted.

## BACKGROUND

**I.    The Plan**

Prior to claiming disability and up until Plaintiff stopped working in April 2006, he was employed by Florida Power & Light Company ("FPL"), first as a substation electrician in Miami, Florida and then as a service dispatcher in Melbourne, Florida. *See* Doc 32-1, pp. 11-12, 16. While employed by FPL, Plaintiff was a member of the bargaining unit ("Union") subject to the

Memorandum of Agreement ("MOA") between FPL and the International Brotherhood of Electrical Workers ("IBEW"). *Id*. At all relevant times, Plaintiff was enrolled in the benefit plan ("the Plan") through his former employer, FPL. *See* Doc. 12, ¶ 4. The Plan covers all current and former FPL employees. *Id*. at ¶ 4. The Plan provides long term disability ("LTD") benefits to FPL Group, Inc. subsidiaries, including FPL. *See* Doc 12, ¶ 5. The Plan is self-insured and provides LTD benefits to Union participants who become disabled, as defined in the Plan documents and the MOA. *See* Doc. 7, Ex. B, pp. 105-112. With regard to LTD benefits, the terms of the Plan and the MOA define disability, generally, as "a condition that is not caused by a pre-existing condition, but one that prevents you from performing the material and substantial duties of any occupation with reasonable continuity during the waiting period." *Id.* at 106. Specifically, disability is defined:

> A non-work related illness (including pregnancy) or injury that prevents an employee from performing the material and substantial duties of his or her job. It is assumed that:
> - The disability occurs while the employee is covered by the plan
> - The employee is disabled from any occupation including his or her regular occupation
> - Appropriate care and treatment from a doctor is being received on a continual basis
> - Loss of earning is a direct result of the disability not from other economic factors

(Declaration of Alyssa Coleman, ¶¶ 4,5)

The Plan offers two LTD options to full-time bargaining employees: (1) 60% of pay or (2) 60% of pay plus a cost of living adjustment ("COLA"). *Id.* at 105. Under the Plan, LTD benefits begin on the later of (1) 150 days from the date you could not work because of your illness or injury; (2) 150 days from the date of your application if you were out on an intermittent basis and worked less than 30 days of the 150-day waiting period; or (3) the end of your short term disability benefits.

*Id*. at 106. LTD benefits generally cease when the individual turns 65 years of age, or after 36 months of payment for disabilities arising from mental, nervous, and substance abuse disorders. *Id.* at 105. The Employee Benefits Plan Administrative Committee ("EBPAC") is the Plan administrator. *Id*. at 178. As administrator, the EBPAC is responsible for, and has full discretionary authority for, administering and interpreting the Plan and for making final decisions on such issues as eligibility and payment of benefits. *Id*.

## II. Medical History

On May 6, 2000, while employed with FPL as a substation electrician in Miami, Plaintiff suffered an injury to his left knee while walking up a flight of stairs. *See* Doc 32, Ex. A, pp. 15-16; AR42.[1] This injury was followed by three surgeries on Plaintiff's left knee, however he has remained symptomatic. *Id*. On October 2, 2000, Plaintiff suffered a slip and fall injury which resulted in pain to Plaintiff's neck, back, and shoulder. *Id*. On or around February 7, 2001, Plaintiff began treatment with orthopedist Stephen Wender, M.D. ("Doctor Wender"). AR202. At that time, Plaintiff complained of problems from his left knee as well as prior surgeries. *Id*. Plaintiff returned to Doctor Wender on April 16, 2001 and underwent an MRI scan which showed degenerative change and the possibility of a tear of the medial meniscus. *Id*. Plaintiff returned to Doctor Wender several times from 2001 on, and was periodically administered Synvisc injections. *Id.* On September 22, 2003, Doctor Wender diagnosed Plaintiff as depressed, having back pain, as well as problems with his left shoulder and both knees. *Id*. Several of Doctor Wender's notes state that Plaintiff has continued to have left shoulder pain, left knee pain, and lower back pain. *Id.* Additionally,

---

[1]References to "AR" are to the Administrative Record, which Defendant filed in support of Defendant's motion for summary judgment. *See* Docs. 21-31. The Administrative Record is identified as A1-A406.

following these initial injuries, records suggest that Plaintiff is only able to ambulate for short distances, uses a cane to walk, and uses an electric scooter otherwise. *Id*. On January 26, 2005, Doctor Wender gave Plaintiff a "20% impairment" rating. *Id*. On or around April 2006, Doctor Wender recommended Plaintiff cease working. AR1.

Because of Plaintiff's inability to ambulate due to his knee and shoulder problems, he was unable to continue as a substation electrician and was subsequently transferred to a job as a service dispatcher. AR53. According to Plaintiff, the main duties of a dispatcher are to dispatch "trouble calls" to the crew. On July 14, 2005, while employed with FPL as a service dispatcher in the Melbourne Service Center, Plaintiff was injured. *See* Doc 32, Ex. A, p. 17. The incident was precipitated by Plaintiff's stepping backwards into a cubicle and having his left foot caught in the door, causing him to fall backwards through the doorway and rendering him unconscious. AR1. Plaintiff was subsequently transported to Holmes Regional Medical Center by ambulance where he received testing. AR202. An emergency room report from the hospital states that Plaintiff was having right shoulder pain and other associated symptoms. *Id*. An x-ray of his right shoulder was taken, showing degenerative changes. *Id.* A CT scan of Plaintiff's brain was returned negative. *Id.* As a result of his injury on July 14, 2005, Plaintiff was seen at Melbourne Urgent Care Center on July 25, 2009. AR202. The treating doctor at that appointment is unknown. The impression at that time was shoulder pain, upper trapezius strain, cervical strain, and headache. *Id*. On July 29, 2005, Plaintiff was again seen at Melbourne Urgent Care Center for a follow up appointment by Krishna Vara, M.D. ("Doctor Vara"). AR259. At that time, Plaintiff complained of right shoulder, neck, and lower back pain. *Id*. Doctor Vara's impression was that Plaintiff had resolving upper thoracic,

cervical, and right shoulder strain. *Id.* Doctor Vara further noted that Plaintiff could return to modified duties, with sitting and standing as tolerated. *Id.*

In July of 2005, Plaintiff began treatment with Charles D. Mutter, M.D., P.A., ("Doctor Mutter") in his capacity as a psychiatrist. AR192. Doctor Mutter has noted the following diagnoses with regard to Plaintiff: post-traumatic stress disorder with anxiety; depression; and claustrophobia. AR192-193. Additionally, on April 10, 2006, Doctor Mutter opined that Plaintiff was unable to work due to depression and pain. AR253.

On or around June 22, 2006, Plaintiff was seen by neurologist, Gary Weiss, M.D. ("Doctor Weiss") for an initial neurologic examination due to injuries suffered in his fall on July 14, 2005. AR210-213. During that examination, Plaintiff complained of the following: neck pain radiating to his right more than his left trapezius; shoulders and arms to the hands and fingers with dull pain in the trapezius as well as burning pain radiating; numbness and tingling in both arms and fingers; mid back pain between the shoulders with aching pain radiating from the neck; occasional shortness of breath, post-traumatic stress disorder/anxiety and chest pressure; lower back pain that is constant on the left side radiating to the buttocks, hips, and left leg to the foot and toes. AR212. Doctor Weiss' impression at that time was that due to the July 14, 2005 injury, Plaintiff suffered from: "concussion with post-traumatic headaches, dizziness, deceased memory, and [post-traumatic stress disorder]; neck pain with herniated nucleus pulposus C5-6 and C6-7 with right C6, 7 radioculopathy; increased low back pain with increased left radioculopathy; and right shoulder pain." AR210. Also on June 22, 2006, Doctor Weiss determined that Plaintiff was temporarily totally disabled, and may be permanently totally disabled without accommodation. *Id*. Plaintiff ended his employment with

FPL in April of 2006. On October 19, 2006, Plaintiff was deemed "permanently totally disabled" by Doctor Weiss, based upon Plaintiff's neurologic condition. AR3.

### III. Administrative History

#### A. Initial Aetna Application for LTD Benefits

On July 1, 2006, Plaintiff applied for LTD benefits for physical disability and mental health disability. AR317-319. In reviewing the claim, Aetna, the Plan's third party administrator, reviewed medical documentation provided by Doctor Wender and Doctor Weiss. AR303-304. Additionally, Aetna had peer reviews of Plaintiff's physicians conducted by neurologist Gerald Goldberg, M.D. ("Doctor Goldberg") and orthopedist George Crane, M.D. ("Doctor Crane"). AR123-129. Doctor Goldberg ultimately concluded that "even though there are some abnormalities described in the neurologic examination, they appear to have been present from even before the claimant went out of work and there is no indication that, from a neurologic standpoint, the neurologic deficits described would produce a functional impairment that would preclude the claimant from being able to work at 'any occupation.'" AR125. Similarly, Doctor Crane found "[t]he diagnostics certainly indicates some pathology, but there is no record as to the correlation between the diagnostics and a clinical examination. Therefore, it does not support a functional impairment from 4/6/2006 through 8/15/2006 for any occupation." AR128. Attempts to contact Doctor Wender and Weiss were made by the peer reviewers to no avail. *Id*. Also, Aetna Senior Field Case Manager Jill Klein Radke ("Case Manager Radke") conducted an Employability Assessment Report and Labor Market Study and found that Plaintiff was able to perform "Sedentary to Light level work with adjustments for the activities of lifting over 20 pounds." AR304. Based on those restrictions and limitations, Case Manager Radke determined that Plaintiff was capable of performing positions as a Production,

Planning, and Expediting Clerk. *Id*. On September 29, 2006, Plaintiff was notified that his application for LTD benefits had been denied by Aetna. AR126. In the decision, Aetna ultimately concluded that, "the medical documentation does not reveal a functional impairment from any occupation." AR303. Plaintiff was advised of his right to appeal. *Id.*

### B. Appeal of Aetna's Denial of LTD Benefits

On February 14, 2007, Plaintiff appealed Aetna's denial of LTD benefits. AR294-302. The appeal asserts that Aetna's denial was based on "purportedly unsuccessful attempts to contact two of [Plaintiff's] physicians" and the contention that "Aetna apparently did not even attempt to contact [Plaintiff's] psychiatrist, Doctor Mutter." AR294. In reviewing the appeal, Aetna considered additional documentation, including materials from physicians and doctor's offices. AR285-286. Moreover, Aetna had Plaintiff's file reviewed independently by psychologist Elena Mendelssohn, Psy. D. ("Doctor Mendelssohn"), physical medicine and rehabilitation specialist Lucy Cohen, M.D. ("Doctor Cohen"), and neurologist Vaughn Cohan, M.D. ("Doctor Cohan"). AR130-147. Additionally, Doctor Mendelssohn conducted a telephonic discussion with Doctor Mutter. AR286.

Doctor Cohen found that "based on the provided documentation the information fails to support a functional impairment from 9/1/06 through [3/30/07] from any occupation." AR137. Doctor Cohen further noted that even though Plaintiff does have decreased range of motion and strength deficits, he still is "able to function in a motorized wheelchair, therefore he would be capable of work at the sedentary level." *Id*. Similarly, Doctor Cohan found that "the documentation provided does not demonstrate objective evidence of a neurologic impairment for work effective 9/1/06," but that evidence does demonstrate that Plaintiff "would be restricted to performing sedentary or light work by virtue of his confinement for the most part to a motorized wheelchair."

AR146. Doctor Mendelssohn found Plaintiff's claims of cognitive, emotional, and behavioral functioning impairment to be unsubstantiated and concluded that the "information provided does not support the presence of a functional impairment from 9/1/06 through [4/2/07]." AR141. Moreover, Doctor Mendelssohn confirmed these findings per the telephonic discussion with Doctor Mutter. AR130-133. On May 24, 2007, Aetna informed Plaintiff of its appeal decision upholding the denial of LTD benefits, stating "the documentation in [Plaintiff's] file lacked medical evidence to support [Plaintiff's] inability to perform the material and substantial duties of any occupation." *Id.* at AR285. Aetna informed Plaintiff of his right of appeal to the EBPAC. *Id.*

### C. EBPAC Appeal of LTD Benefits

On November 15, 2007, Plaintiff appealed the denial of LTD benefits to the EBPAC. AR16-17. The EBPAC reviewed Plaintiff's appeal of the adverse benefits determination and the documentation in the administrative record, including medical documentation, records submitted by Plaintiff's treating physicians, peer reviewers engaged by Aetna, the claims administrator, Workers' Compensation records, and deposition transcripts. AR62. Additionally, medical peer reviews were conducted by psychiatrist/neurologist Laszlo J. Mate, M.D., P.A. ("Doctor Mate") and orthopedist Robert Green, M.D. ("Doctor Green"). AR42-45. An independent medical evaluation, which involved interviewing and examining Plaintiff, was also conducted by neurologist John LoZito, M.D. ("Doctor Lozito"). AR200-203. Moreover, the EBPAC requested that Plaintiff undergo an independent medical exam with psychologist Jeffrey Williamson, Ph.D. ("Doctor Williamson"). AR51-61. Doctor Mate found that "the 7/14/2005 accident did not significantly contribute to [Plaintiff's] subjective symptoms and disability" and that "based on the information contained in these records, [Plaintiff] should be able to perform eight hours of sedentary work without any

problem." AR43. It was Doctor Green's impression that Plaintiff "should be able to work at a desk doing sedentary type work" and that "most of [Plaintiff's] current problems date back to the early 2000 and 2001 injuries." AR45. With regard to Plaintiff's independent medical exam, Doctor Lozito found the following: (1) Plaintiff did not have a permanent impairment or disability related to his July of 2005 accident; (2) all of Plaintiff's symptoms and problems were pre-existing; (3) Plaintiff's current complaints do not fit any anatomic or psychologic patterns; and that (4) no further treatment is needed related to his July 2005 injury. AR203. Doctor Williamson found that Plaintiff "has a dysthymic pain disorder that comes from legitimate medical causes and that is related to multiple knee surgeries, shoulder problems, and back difficulties." AR60. Doctor Williamson also states that "[w]hile it is believed [Plaintiff] is capable of sustaining work performance for more than 30-45 minutes . . . there is no question to this examiner that he cannot sustain work performance for an 8-hour day . . .". *Id*. On February 2, 2009, the EBPAC notified Plaintiff of its decision to reverse the denial of the mental health disability benefits and uphold the denial of physical disability benefits. AR62-63. With regard to the physical disability benefits, the EBPAC specifically found that "[b]ased on all the evidence contained in the administrative record, the EBPAC does not find that [Plaintiff] meets the plan's definition of disability in regard to his physical conditions." AR 62. Plaintiff received the maximum 36 months of LTD benefits for mental health disability per the terms of the Plan. *Id.* The payments for all 36 months, retroactive to September 2006, were made via electronic transfer to Plaintiff's bank account on or about September 9, 2009. *See* Doc. 32-1, p. 39. Plaintiff was notified that the EBPAC's review constituted a final determination under the Plan's administrative guidelines and that there was no further appeal through Aetna or FPL. AR62.

Plaintiff was also advised of his right to bring an action under section 502(a) of the Employee Retirement Income Security Act of 1970 ("ERISA"). *Id.*

On July 19, 2010, Plaintiff filed an Amended Complaint for an action for LTD benefits pursuant to ERISA (Doc. 12). Plaintiff claims that Defendant interfered with Plaintiff's rights under the Plan and under ERISA by arbitrarily and capriciously denying him LTD benefits to which he is entitled under the Plan. *Id.*

## **STANDARD**[2]

ERISA does not provide a standard for district courts to apply when reviewing decisions of plan fiduciaries or administrators' denial of benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 190 S.Ct. 948, 103 L.Ed.2d 80 (1980). The court reviews the "plan documents to determine whether they grant the administrator discretion in making benefits determinations." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008). As a result, and based on the Supreme Court's guidance in *Firestone* and *Glenn*, *see Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008), the Eleventh Circuit has established a multi-step framework to guide courts in reviewing an ERISA plan

---

[2]Though this case comes before the Court on a motion for summary judgment, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure is incongruent with the ERISA standard of review. *Compare* FED. R. CIV. P. 56(a) and *Williams*, 373 F.3d at 1138; *see also Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002). The Eleventh Circuit charges the district court with determining *de novo* whether the administrator's decision was wrong, *Williams*, 373 F.3d at 1138, rather than whether there is a genuine dispute as to any material fact that requires trial and whether the parties are entitled to judgment as a matter of law, FED. R. CIV. P. 56(a). There may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would. *See Leahy*, 315 F.3d at 17; *see also* this Court's decision in *Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272-73 (M.D. Fla. 2006) (in-depth discussion of interplay between ERISA and summary judgment standards as applied by courts in the Middle District of Florida and elsewhere).

administrator's benefit decisions. *See e.g. Blankenship v. Metropolitan Life Insurance Company*, 644 F.3d 1350, 1354-55 (11th Cir. 2011). The first five steps have remained unchanged since establishing the framework in *Williams v. BellSouth Telecommunications, Inc*. *See Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137-38 (11th Cir. 2004) (overruled on other grounds by *Doyle v. Liberty Life Assurance Company of Boston*, 542 F.3d 1352 (11th Cir. 2008)). After the *Glenn* decision, steps one through five remain intact while step six has been modified. Thus, a court reviewing a plan administrator's benefits decision must follow this analysis:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e. the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision is '*de novo* wrong,' then determine whether he was vested with discretion in reviewing claims; if not; end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is '*de novo* wrong' and he was vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decisions; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict of interest, then end the inquiry and affirm the decision.
> (6) If there is a conflict, the conflict should be merely a factor for the court to take into account when determining whether an administrator's decision was arbitrary or capricious.

*See Capone v. Aetna Life Insurance Company*, 592 F.3d 1189, 1196 (11th Cir. 2010). This case falls under the category of ERISA cases involving a conflict of interest because Defendant, as the administrator of the plan, also acts as a fiduciary and makes discretionary decisions, all while serving as the insurance company paying the claims out of its own assets. *See Glenn*, 554 U.S. at 114 (holding that where plan administrator is not the employer but is itself a professional insurance company, a conflict exists). Thus, pursuant to *Glenn* and *Doyle*, this Court will consider Defendant's conflict when determining whether Defendant's decision was arbitrary and capricious.

Additionally, in the initial *de novo* review, the plaintiff bears the burden of proving that he is disabled . *Glazer*, 524 F.3d at 1247. The burden is also on the plaintiff to show that an administrator's decision was arbitrary. *Doyle*, 542 F.3d at 1360.

## **ANALYSIS**

As will be discussed below, Defendant has discretion under the Plan to administer and interpret the Plan. It has been held that a denial of ERISA benefits is reviewed *de novo* except when the Plan confers discretionary authority on its administrator over either the eligibility determinations or construction of the Plan's terms. *Firestone*, 489 U.S. at 115. *See also Pinto v. Aetna Life Ins. Co.*, 2011 WL 536443 ( M.D. Fla. February 15, 2011). Here, the Plan administrator has full discretionary authority for administering and interpreting the Plan and for making final decisions on issues such as eligibility and payment of benefits. *See* Doc. 7, Ex. A, p.23 and Ex. B, p. 178; AR 98, 101. Therefore, the Court will begin its examination at Step Two of the *Williams/Doyle* analysis. In other words, the Court will proceed as if Defendant's decision, were it reviewable under the *de novo* standard, was in fact wrong. Based on the facts presented in the administrative record, the parties' submissions to the Court, and the language of the Plan, the Court finds that Defendant's final decision denying Plaintiff's claim for LTD benefits was based on reasonable grounds, and therefore, was not arbitrary and capricious.

### I. **Was Defendant Vested With Discretion?**

There appears to be no dispute that the Plan administrator, the EBPAC, was vested with discretion in reviewing this claim. *See* Doc. 7, Ex. B, p. 178. As administrator, the EBPAC is responsible for, and has full discretionary authority for, administering and interpreting the plans and

for making final decisions on such issues as eligibility and payment of benefits. *Id*. Accordingly, Defendant's discretion compels application of the deferential arbitrary and capricious standard.

## II. Was Defendant's Decision Supported by Reasonable Grounds?

The appropriate inquiry is whether there was a reasonable basis for Defendant's decision, based upon the facts as known to the administrator at the time the decision was made. *See Doyle*, 542 F.3d at 1360. As long as the decision had a reasonable basis, it "must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary conclusion." *White*, 542 F.3d at 856. If the "evidence is close," then the administrator did not abuse its discretion, and the requisite deference compels the Court to affirm the administrator's decision. *Doyle*, 542 F.3d at 1363. In the Motion for Summary Judgment, Defendant sets forth two main arguments as to why the administrator's decision should be affirmed: (1) Plaintiff was not disabled from any occupation and (2) the record does not demonstrate Plaintiff's inability to work in any occupation throughout the 150-day waiting period. *See* Doc. 19, pp. 15-22.

As Defendant's first major argument, it points to the Employability Assessment Report and Labor Market Study conducted by Case Manager Radke. AR304. After reviewing the medical records, including physician peer reviews, Radke performed a transferable skills assessment which identified five occupations at the Sedentary level that Plaintiff could perform. *Id.* This included Plaintiff's former position as a service dispatcher. Defendant argues that as it was found that Plaintiff could perform his previous job, he was not disabled from any occupation. *See Cook v. Standard Insurance Co.*, 2010 WL 807443 at *4 (M.D.Fla. Mar. 4, 2010) (finding a plaintiff who is capable of returning to work in his own occupation, will also be determined not disabled under the subsequent "any occupation" test).

Defendant's second major argument is that the record does not demonstrate Plaintiff's inability to work in any occupation throughout the 150 day waiting period, as required under the Plan. *See* Doc. 19, p. 17. To that end, Defendant argues that "injuries sustained by [Plaintiff] in his fall of 2005 had dissipated as of April 2006, which was well ahead of the Waiting Period" and because of that "[i]t is therefore beyond dispute that those injuries did not cause him to be totally disabled within the meaning of the Plan." *Id*.

Defendant cites a great deal of evidence from the administrative record supporting this contention. After the initial application for LTD benefits in July of 2006, Doctors Goldberg and Crane both conducted medical peer reviews of Doctors Wender and Weiss. AR123-129. Both doctors ultimately found that the documentation provided did not support a functional impairment that would have prevented Plaintiff from working. *Id*. In reviewing Plaintiff's first appeal of the denial of LTD benefits, Doctors Mendelssohn, Cohen, and Cohan conducted independent reviews of Plaintiff's file. AR130-147. Doctor Mendelssohn also conducted a telephonic discussion with Doctor Mutter. AR286. Once again, each of these doctors found that Plaintiff's file lacked medical evidence to support his inability to perform the material and substantial duties of any occupation. *Id*. In the EBPAC's review of Plaintiff's appeal, medical peer reviews were conducted by Doctors Mate and Green. AR42-45. Both doctors agreed that Plaintiff should be able to perform sedentary work. *Id*. Additionally, independent medical exams were conducted by Doctors Lozito and Williamson. AR60, 203. The independent medical evaluations involved interviewing and examining Plaintiff. *Id*. In particular, Doctor Lozito found Plaintiff did not have a permanent impairment or disability related to his July 2005 accident. AR203.

Plaintiff responds that the "EBPAC abused its discretion in discounting the subjective evidence in the administrative record of [Plaintiff's] pain and the objective evidence in the record corroborating the pain" including "its reviewers ignored and derogated the medical records of [Plaintiff's] treating neurologist and orthopedist – plus the complaints of [Plaintiff] himself – that [Plaintiff] was fully and totally disabled." *See* Doc. 38, p. 17. The physicians Plaintiff alludes to are Doctors Wender, Mutter, and Weiss (collectively, "Primary Physicians"). Doctor Wender is an orthopedist, who Plaintiff began treating with in early 2001. AR202. According to Doctor Wender, Plaintiff has continued to have left shoulder pain, left knee pain, and lower back pain throughout his treatments. AR53. On or around April 2006, Doctor Wender recommended Plaintiff be taken off work. AR192. Doctor Mutter is a psychiatrist, who Plaintiff began treating with in July of 2005. Doctor Mutter has diagnosed Plaintiff with post-traumatic stress disorder with anxiety, depression, and claustrophobia. AR192-193. Additionally, on April 10, 2006, Doctor Mutter opined that Plaintiff was unable to work due to his depression and pain. AR253. Doctor Weiss is a neurologist, with whom Plaintiff began treatment with on or around June 22, 2006. AR210-213. On October 19, 2006, Doctor Weiss categorized Plaintiff as "permanently totally disabled," based upon Plaintiff's neurologic condition. AR3.

"Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823-24, 123 S.Ct. 1965, 1965, 155 L.Ed.2d 1034 (2003). Even Plaintiff points out that " . . .

there is no treating physician preference in the ERISA context . . . ". Doc. 38, p. 17 (citing *Schully v. Continental Casualty Co.*, 634 F.Supp.2d 663, 683 (E.D.La. 2009)). Based on the record, the Court finds that the EBPAC did not "ignore" or "derogate" the opinions of the Primary Physicians. Rather, the opinions of non-treating Doctors Goldberg, Crane, Mendelssohn, Cohen, Cohan, and Lozito were attributed more weight, which was well within the Administrator's discretion. Moreover, Defendant has presented substantial evidence of grounds for the administrator's decision.

As further evidence of bias, arbitrariness and capriciousness, Plaintiff contends that EBPAC dismissed the Social Security Administration's determination of Plaintiff's disability without meaningful analysis or discussion. *See* Doc. 38, p. 19. As noted by this Court in *Herman v. Metropolitan Life Ins.Co.*, 689 F.Supp.2d 1316, 1326 (M.D. Fla. 2010), the legal principles controlling the social security analysis are different from those governing the ERISA analysis. For example, a treating physician's opinion is given priority in the social security analysis, but not in the ERISA context. *Id.* Additionally, the administrative record reflects that the social security determination was made in February 2007, after Aetna's denial of benefits in September 2006. AR 277. It is unknown if the social security determination was for a physical or mental health disability. Thus, based on the administrative record, the Court finds that Defendant's decision to deny Plaintiff LTD benefits was not arbitrary and capricious.

### III. Was Defendant Operating Under a Conflict of Interest?

This case falls under the category of ERISA cases involving a conflict of interest because Defendant, as the administrator of the plan, also acts as a fiduciary and makes discretionary decisions, all while serving as the insurance company paying the claims out of its own assets. *See Glenn*, 554 U.S. at 114 (holding that where plan administrator is not the employer but is itself a

professional insurance company, a conflict exists). However, "the presence of a structural conflict of interest – an unremarkable fact in today's marketplace – constitutes no license, in itself, for a court to enforce its own preferred de novo ruling about a benefit's decision." *Blankenship v. Metropolitan Life Insurance Company*, 644 F.3d 1350, 1356 (11th Cir. 2011). Here, the administrative record reflects that the Plan's assets are held in a non-reversionary, irrevocable trust, administered by an independent trustee and funded through periodic employer contributions and investment earnings on Plan assets. (Declaration of Alyssa Coleman, ¶ 6)Following *Glenn* and *Doyle*, and after considering Defendant's conflict, the Court concludes that Defendant's decision was not unreasonable, and therefore, not arbitrary and capricious. There is nothing in the totality of the circumstances that indicates that Defendant's conflict of interest was a major factor in its decision. Plaintiff has failed to meet its burden of establishing that the Defendant's decision was arbitrary.

Based on the foregoing, the Court finds that even if Defendant's denial of benefits could be regarded as *de novo* wrong, the decision was not arbitrary and capricious, and therefore must be affirmed. Accordingly, Defendant's motion for summary judgment will be granted.

Accordingly, it is hereby **ORDERED and ADJUDGED**:

1. Defendant Health and Welfare Plan for Employees of Florida Power and Light Group, Inc.'s Motion for Summary Judgment (Doc. 19) is **GRANTED**. Defendant's request for oral argument is **DENIED**.

2. The Clerk is directed to terminate any pending motions and deadlines and enter final judgment in favor of Defendant. The judgment shall provide that Defendant shall recover its costs of this action.

3. The Clerk is directed to close this case.

**DONE AND ORDERED** at Orlando, Florida on March 28, 2012.

COPIES TO:
COUNSEL OF RECORD

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge